# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EILEEN CRAIG,
              *Plaintiff-Appellant,*

                v.

M&O AGENCIES, INC., an Arizona
corporation dba Mahoney Group;
LEON BYRD, individually and in his
capacity as President of M&O
Agencies, Incorporated dba The
Mahoney Group; PATRICIA
ROBERTS, an individual & wife of
Leon Byrd; JOHN/JANE DOES, 1-10;
ABC CORP, 1-10; ABC
PARTNERSHIPS, 1-10,
              *Defendants-Appellees.*

No. 05-16427

D.C. No.
CV-04-00232-MLR

OPINION

Appeal from the United States District Court
for the District of Arizona
Manuel L. Real, District Judge, Presiding

Argued and Submitted
June 15, 2007—San Francisco, California

Filed August 9, 2007

Before: Alfred T. Goodwin, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Ivan K. Mathew & Susan T. Mathew, Mathew & Mathew, Phoenix, Arizona, for the appellant.

Stephanie J. Quincy & Gregg J. Tucek, Sherman & Howard, Phoenix, Arizona, for the appellees.

**OPINION**

BYBEE, Circuit Judge:

Eileen Craig appeals the district court's grant of summary judgment in favor of M&O Agencies (dba The Mahoney Group),[1] Leon Byrd and Patricia Roberts (collectively "Appellees") in her sexual harassment suit. Craig alleges that the repeated advances of her direct supervisor, Leon Byrd, and the company's cursory investigation constituted an actionable claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., as well as various Arizona state laws. We reverse the grant of summary judgment with respect to The Mahoney Group on the Title VII hostile environment claim and the assault and battery claim brought under a theory of respondeat superior, but affirm summary judgment on all other claims. We affirm the district court's grant of summary judgment for defendants on all claims with respect to Patricia Roberts, and all claims (except assault and battery and intentional infliction of emotional distress) with respect to Leon Byrd. With respect to the assault and battery claim, we affirm the district court's denial of summary judgment with respect to Leon Byrd, but we reverse the dismissal and reinstate the claim. We reverse the district court's grant of summary judgment for Leon Byrd on the intentional infliction of emotional distress claim and remand to the district court for further proceedings.

## I.  BACKGROUND

This suit stems from incidents inappropriate in any work environment and made all the more egregious here because they were perpetrated on the plaintiff by her direct supervisor.

---

[1] M&O Agencies is the legal name of the Arizona corporation which does business as The Mahoney Group. For convenience, we will defer to the practice of the parties and refer to the corporate defendant as "The Mahoney Group."

The following facts are largely undisputed by the parties. Craig worked for The Mahoney Group as the branch manager in Tucson and reported to Byrd who was the interim president. Over the course of several months, Byrd made repeated inappropriate comments to Craig about her legs and how she should wear shorter skirts. Although Craig thought the comments were obnoxious, she was not particularly offended. The situation took a turn for the worse on August 8, 2003, when, at Byrd's invitation, Craig met him for drinks after work at an On the Border restaurant. She had previously been to other happy hours and lunches with Byrd to discuss work related matters and thought this would be a similar meeting. Craig and Byrd drank wine and at one point, Byrd asked Craig "if she had ever thought of making love to him" and told her that he would like to take off the blue dress she was wearing. Later Byrd invited her back to his house to drink more wine in his hot tub and told her that "it's not a matter of if but when" something would happen between them. Craig laughed and shook her head at Byrd's comments but did not leave the restaurant.

Around 8:00 p.m., Craig excused herself to go to the restroom, and moments later Byrd followed her into the women's bathroom. When Craig exited the stall, Byrd approached her, grabbed her arms, "gave her an open-mouthed kiss and stuck his tongue in her mouth." The kiss ended when someone walked into the restroom. Byrd exited and Craig remained in the restroom for five minutes to compose herself, after which she picked up her purse from the table and left the restaurant alone while Byrd was paying the check. Byrd called Craig's phone later that night, but hung up when her husband answered. Craig's husband urged her to report the incident, but she refused.

Approximately one week after the happy-hour incident, the tenacious Byrd called Craig from the golf course, told her she was beautiful and asked her out for another drink, which she declined. Undeterred, Byrd later called Craig from a hotel

room in Wisconsin and upon his return to Tucson went into Craig's office and repeatedly asked her if she would like to make love to him. Craig's response was consistently an emphatic "no." On August 14, 2003, Byrd told Craig that he "wanted" her and asked her if she remembered telling him that she "wanted to make love to him." Craig said "nothing's [sic] is going to happen between us" and denied ever telling him that she "wanted to make love to him."

Shortly thereafter Byrd apologized to Craig and told her that he wanted to remain friends and put the whole situation behind him, but two days later asked Craig why she was cold and distant toward him. He again asked her why she didn't remember saying that she wanted to "make love to him," and told her that he still had feelings for her, but said that if she wanted him to leave her alone, he would do so. At some point Byrd told Craig that he didn't think he could work with her anymore, but never explicitly conditioned her continued employment or promotion on entering a sexual relationship with him. On August 27, 2003, Craig finally reported Byrd's conduct to Dawn Zimbleman, one of the individuals (in addition to Byrd) listed on the company's sexual harassment policy to whom complaints should be made. Reporting the claim spurred the company to immediate action. Byrd was instructed to stay away from Craig and to stop making sexual comments to her, and Craig began reporting to John McEvoy, another company executive. Additionally, the company appointed a senior executive to investigate the complaint, but replaced him with the Group's outside corporate counsel, Denis Fitzgibbons, when it was brought to the company's attention that the executive had previously been investigated for sexual harassment. Craig alleges that she provided Fitzgibbons with the names of other people who had been sexually harassed by Byrd, but Fitzgibbons declined to include any of this information in his report or follow up on the leads.

After investigating, Fitzgibbons recommended that (1) the Group offer Craig and her husband counseling sessions at the

company's expense; (2) Byrd receive a severe written reprimand worded in such a way as to put him on notice that if he engaged in this type of behavior again, he would be terminated; (3) Byrd attend sexual harassment sensitivity training; and (4) all of the Group managers and supervisors receive sexual harassment training in the near future.

In late September 2003, Craig was told that the investigation was complete, and she began reporting to Byrd again. Craig claims that Byrd retaliated against her "by ignoring her, failing to respond to her emails, providing budget information to her late, and by corresponding with the corporate office instead of her" about situations she would normally handle. The company did conduct sexual harassment training for the executives, but Craig alleges that during one sexual harassment training session, the Company's chairman came in and made an inappropriate joke.

Craig claims that due to the ineffective response of The Mahoney Group and Byrd's repeated comments, she began to get sick, experienced panic attacks, and had emotional difficulties and trouble sleeping. The company claimed it was unable to remove Byrd from the Tucson office or transfer Craig, and consequently re-assigned some of her job functions. Eventually Craig resigned, citing medical problems and stress.

Craig filed a complaint, which she later amended, alleging: (1) sex discrimination under Title VII, (2) intentional infliction of emotional distress, (3) negligent investigation, (4) assault and battery, (5) negligent hiring supervision and retention, (6) an Arizona state law civil rights claim, (7) retaliation in violation of Title VII, (8) invasion of privacy, (9) defamation and slander, and (10) vicarious liability under a theory of respondeat superior. She listed The Mahoney Group, Leon Byrd and Byrd's wife, Patricia Roberts, as defendants.

Appellees filed a motion for summary judgment on February 8, 2005. After a hearing, the district court granted sum-

mary judgment as to defendants The Mahoney Group and Patricia Roberts on all claims. The court further granted summary judgment with respect to Byrd as to all causes of action except for the assault and battery claim, which he dismissed without prejudice to allow for filing in state court. We note that contrary to common court practices, the district court did not explain its reasoning either orally from the bench or in its terse order.

## II.   DISCUSSION

### A.   *Standard of Review*

We review a grant of summary judgment de novo to determine whether there are any genuine issues of material fact at issue and whether the district court correctly applied the relevant law. *Sengupta v. Morrison-Kundsen Co.*, 804 F.2d 1072, 1074 (9th Cir. 1986). All reasonable inferences must be drawn in the nonmoving party's favor, but are limited "to those upon which a reasonable jury might return a verdict." *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We may affirm if the result reached by the district court was correct even if the district court relied on an erroneous ground. *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985), *as amended*, 784 F.2d 1407 (9th Cir. 1986).

### B.   *Craig's Title VII Claims Against The Mahoney Group*

**[1]** We first address The Mahoney Group's liability under Title VII for Byrd's actions. Title VII of the Civil Rights Act of 1964 forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition "is not limited to 'economic' or 'tangible' dis-

crimination," but includes sexual harassment that is so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks and citations omitted, alterations in original).

**[2]** The Court outlined the principles governing employer liability for sexual harassment in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), both of which involved the harassment of an employee by her direct supervisor. The Court divided cases in which a supervisor harassed a subordinate into two categories. The first category involves situations where "a supervisor exercising his authority to make critical employment decisions on behalf of his employer takes a sufficiently concrete action with respect to an employee." *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2002). In these situations, termed "tangible employment action" or "quid-pro-quo" harassment, the employer may be held vicariously liable under traditional agency law. *Id.*; *see also Ellerth*, 524 U.S. at 760-65. In the second category, which are known as "hostile environment" claims, the Court tempered the agency principles by allowing the employer to assert an affirmative defense if the employer "is able to establish that it acted reasonably and that its [ ] employee acted unreasonably." *Holly D.*, 339 F.3d at 1167; *see also Ellerth*, 524 U.S. at 760-65. We consider both theories.

### 1. Liability under a *quid pro quo* theory

To prove actionable harassment under a *quid pro quo* or "tangible employment action" theory, Craig must show that Byrd "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994). If a plaintiff is able to make such a showing, the employer is strictly liable for the supervisor's con-

duct. *Id.* at 510 ("employers are held strictly accountable if they place in positions of authority persons who extract sexual favors from those over whom they exercise power.").

**[3]** Craig does not allege that Byrd explicitly conditioned her continued employment with The Mahoney Group on her acquiescing to sexual relations with him. She did testify that she felt she had to consent if she wanted to keep her job, yet she offers little else to support her contention. Byrd's comment "I just don't think I can work with you anymore" is merely a "vague and unsupported allegation," which we have held is insufficient to cause a reasonable woman to believe that retaining her job was conditioned on having sex with her supervisor. *See Holly D.*, 339 F.3d at 1176. Additionally, several other senior executives approached Craig after she reported the harassment and reassured her that her job was not in jeopardy. Because Craig, who did not acquiesce to Byrd's demands, was neither demoted nor fired, nor did she suffer any other "tangible employment action," *id.* at 1173, we agree with the district court that Craig has not made out a prima facie case for liability under Title VII on a theory of *quid pro quo* harassment.

2.   Liability under a hostile environment theory

Craig alternatively could sustain her Title VII action under a hostile work environment theory of liability. To make a prima facie case of a hostile work environment, a person must show "that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (internal quotations omitted). Additionally, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20-21 (1993)). Objective hostility is determined by examining the totality of

the circumstances and whether a reasonable person with the same characteristics as the victim would perceive the workplace as hostile. *Id.* Finally, to find a violation of Title VII, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788; *see also Fuller*, 47 F.3d at 1527.

**[4]** An employer may be vicariously liable under a hostile environment theory when the harassment is perpetrated by a supervisor "with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807. When no "tangible employment action" (such as firing or demotion) is taken, an employer may avoid liability by asserting a "reasonable care" defense. An employer can sustain the affirmative defense if it shows by the preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*; *see also Holly D.*, 339 F.3d at 1177. Reviewing the record de novo to determine whether summary judgment was proper, we conclude that there are sufficient triable issues of fact to overcome summary judgment with respect to Craig's prima facie case, and that The Mahoney Group did not successfully assert the "reasonable care" affirmative defense.

a.   Craig's prima facie case

Byrd's conduct clearly satisfies the first two prongs of the *Fuller* test. Byrd's behavior was explicitly sexual in nature, and unwelcome, as Craig repeatedly rebuffed his advances and eventually reported his conduct to the company. We also find that Byrd's conduct meets the requirement of being both subjectively and objectively abusive. Craig testified that she felt Byrd's comments and actions—particularly the incident in the bathroom—were abusive and made her feel uncomfortable. The conduct also met the objective standard: A reason-

able woman in Craig's position could feel that Byrd's comments and actions were hostile, demeaning and abusive.

[5] Craig's prima facie showing turns on whether or not Byrd's actions were pervasive and serious enough to amount to "a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. The Supreme Court has cautioned that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[2] *Id.* (internal citation and quotation marks omitted); *see also Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (per curiam) (finding "isolated incidents of sexual horseplay" insufficient to make a working environment "hostile"). Appellees draw our attention to some of our prior cases to suggest that conduct must be more egregious than Byrd's in order to sustain an action under Title VII. *See, e.g.*, *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967-68 (9th Cir. 2002) (involving a plaintiff who was raped three times in one night by a business associate whose actions were essentially condoned by the employer); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105-06 (9th Cir. 1998) (involving an employee who made sexual remarks to a female co-worker over the loudspeakers at work and commented about her body to male co-workers). Although these shocking examples amply illustrate a level of conduct that is sufficient, they do not establish minimum behavior. We are not persuaded that Title VII requires proof of such severe or shocking behavior.

[6] We have repeatedly held that sexual-based conduct that is abusive, humiliating or threatening is sufficient to make a prima facie claim under Title VII and have found liability in

---

[2]Factors a court may consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

situations where the conduct was much less onerous than Byrd's propositions. *See, e.g.*, *Ellison v. Brady*, 924 F.2d 872, 873, 880 (9th Cir. 1991) (reversing a summary judgment grant for the employer, finding that a reasonable woman could find a colleague's misguided "love letter" hostile and abusive, and holding that "[w]ell-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action"); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461-63 (9th Cir. 1994) (reversing a grant of summary judgment where a plaintiff's supervisor called her "offensive names based on her gender," confronted her in front of other employees and customers and criticized her using derogatory, gender-based language); *Fuller*, 47 F.3d at 1522, 1527-28 (reversing a grant of summary judgment for the defendant city, finding that the behavior of plaintiff's ex-boyfriend—repeatedly calling her house and hanging up, threatening to kill himself, running her off the road and getting her unlisted number—constituted an actionable claim under Title VII).

[7] Byrd's conduct falls somewhere between mere isolated incidents or offhand comments, which do not amount to a Title VII claim, *see, e.g., Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1106 (9th Cir. 2000), and serious and pervasive harassment, that clearly comes within Title VII, *see, e.g.*, *Draper*, 147 F.3d at 1105-06. Although Byrd's actions were physically less threatening than those at issue in *Fuller*, Byrd's position as Craig's immediate boss made his actions emotionally and psychologically threatening; repeated pressure to perform sexual favors for one's boss is certainly more coercive than the misguided "love letter" at issue in *Ellison.* Craig was not subjected to Byrd's comments and propositions for a period of years, however, the time period over which it occurred was not de minimis. The harassing behavior included repeated comments several months before the bathroom encounter and included at least four significant incidents after. Byrd's actions, when viewed from his perspective,

might seem innocuous enough, but when viewed from the perspective of a "reasonable woman," his behavior could be understood to be so obnoxious that it "unreasonably interferes with work performance" and, consequently, "can alter a condition of employment and create an abusive working environment." *Ellison*, 924 F.2d at 877; *see also Steiner*, 25 F.3d at 1463.

[8] Craig alleges that Byrd's actions resulted in a concrete change in her working environment. Specifically, she alleges she was removed from many of her duties, received budgets late, had some of her duties reassigned, and was forced to interact with Byrd despite his continued propositions. She claims that these additional stresses in the workplace made her nervous, spawned anxiety attacks and affected her health. Each of her complaints standing alone might not satisfy the standard, but in the aggregate, they are sufficiently serious to amount to an alteration in her condition of employment. We do not know if Craig's claim will ultimately persuade the trier of fact. However, when viewing the facts in the record in the light most favorable to the non-moving party, we conclude that Craig has alleged sufficient facts to state a prima facie case for a violation of Title VII.

b.   The Mahoney Group's affirmative defense

[9] The Mahoney Group argues that even if Craig has alleged sufficient facts to support her Title VII claim, because Craig did not suffer "tangible employment action," it is entitled to assert an affirmative defense. *See Pa. State Police v. Suders*, 542 U.S. 129, 148-49 (2004); *Holly D.*, 339 F.3d at 1168-69. As we previously pointed out, there are two steps to proving a "reasonable care" affirmative defense. First, the employer must show that it exercised reasonable care to prevent and correct any sexually harassing behavior. Second, the employer must show that the employee unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer. *See Faragher*, 524 U.S. at 807.

After examining the record, we hold that The Mahoney Group satisfied the first prong of the affirmative defense—that the company "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Id.* Specifically, the company had a mechanism in place for filing complaints about sexual harassment. When Craig finally did complain, The Mahoney Group addressed the situation promptly: It told Byrd to stay away from Craig, hired outside counsel to investigate and make recommendations, had Craig report to another individual other than Byrd and conducted sexual harassment training.[3] These responsible and prompt actions satisfy the first prong of the test.

[10] The company's affirmative defense fails on the second prong, however, because The Mahoney Group cannot show that Craig "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Id.* at 807. The Mahoney Group argues that Craig unreasonably delayed reporting the harassment because she waited until August 27, 2003 to file a complaint with the company, some 19 days after the incident at the restaurant; it suggests that if Craig had reported the behavior earlier, it is quite possible that Byrd would not have made the subsequent phone calls or repeatedly propositioned her at work. However, we do not think that in this situation a 19-day delay is unreasonable; an employee in Craig's position may have hoped the situation would resolve itself without the need of filing a formal complaint, and she justifiably may have delayed reporting in hopes of avoiding what she perceived could be adverse—or at least unpleasant—employment consequences. Additionally, Craig's behavior is even more reasonable when one considers that Byrd's behavior continued until at least August 20, 2003.

---

[3]Craig alleges that the investigation the company undertook was a "sham" and alleges that outside counsel failed to interview several individuals Craig claimed had also been harassed by Byrd. Because The Mahoney Group's affirmative defense fails on the second prong, we need not address this issue, although it may be a relevant inquiry on remand.

We cannot see how a delay of a mere seven days (including the weekend) rises to the level of being "unreasonable." Craig's delay is markedly different from cases where victims have allowed the harassment to continue for a period of months or years before finally reporting it to the appropriate authority. *See, e.g.*, *Holly D.*, 339 F.3d at 1178 (noting that the plaintiff waited a full two years from the first sexual incident and a full year after she testified the sexual activity was unwelcome before reporting the behavior); *Montero v. AGCO Corp.*, 192 F.3d 856, 863 (9th Cir. 1999) (finding a two-year delay in reporting the conduct to be unreasonable); *see also Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1180-82 (9th Cir. 2001) (holding that failure to report the behavior to the company was unreasonable).

**[11]** We hold that The Mahoney Group's affirmative defense fails, as Craig's minor delay in reporting the behavior did not meet the stringent standard outlined in *Faragher*. Consequently, we reverse the district court's grant of summary judgment for The Mahoney Group and remand for further proceedings. We express no opinion as to whether Craig should prevail on this claim upon remand.

## C. *Craig's Title VII Claim Against Roberts and Byrd*

**[12]** We have long held that Title VII does not provide a separate cause of action against supervisors or co-workers. *See Holly D.*, 339 F.3d at 1179; *Pink v. Modoc Indian Health Project, Inc.*, 157 F.3d 1185, 1189 (9th Cir. 1998); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587-88 (9th Cir. 1993). Consequently, we affirm the district court's grant of summary judgment for Patricia Roberts and Leon Byrd on Craig's Title VII claim.

## D. *Craig's State Law Claims*

Finally, we address Craig's various state law claims.

1. Intentional infliction of emotional distress

**[13]** Craig first claims damages for intentional infliction of emotional distress. To establish a prima facie case, Craig must demonstrate (1) Appellees engaged in "extreme and outrageous conduct;" (2) Appellees either intended to cause "emotional distress or reckless disregard of the near certainty that such distress will result from [Appellees'] conduct;" and (3) Craig suffered "severe emotional distress" as a result of Appellees' conduct. *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 495 (Ariz. Ct. App. 1995). To satisfy the first prong, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. Ct. App. 1969), *overruled on other grounds by Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781 (Ariz. 1989).

Drawing all inferences in Craig's favor, *U.S. ex rel. Anderson*, 52 F.3d at 815, Craig has made a prima facie showing with respect to the second and third prongs; the relevant questions is whether Byrd's conduct was so "outrageous" to satisfy the standard articulated in *Wallace* and *Cluff*. We conclude that it was and reverse the district court's grant of summary judgment. Appellees argue that Craig's claim is "similar to the many other sets of facts courts have rejected as 'outrageous.'" However, the cases they cite are instances involving behavior that a reasonable finder of fact could find less "outrageous" than Byrd's actions. *See, e.g.*, *Cluff*, 460 P.2d at 668 (finding no IIED claim in "the act of an insurance adjuster in simply contacting a person to whom his company may be liable in order to obtain a settlement of that claim, even after retention of counsel"); *Wallace*, 909 P.2d at 495 (affirming a grant of summary judgment on an IIED claim because "recommendations and decisions on nonrenewal of [plaintiff's] administrator contract, the changing of her duties and the reduction of her salary" were lawful and not "outra-

geous"); *Nelson v. Phoenix Resort Corp.*, 888 P.2d 1375, 1386-87 (Ariz. Ct. App. 1994) (finding that the dismissal of an employee in front of the news media was not conduct that would sustain an IIED claim); *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562-64 (Ariz. Ct. App. 1995) (finding that termination decisions are generally insufficient to directly raise an IIED claim and holding that defendant's "failing to promote Plaintiff, forcing her to return to work, and hand delivering a letter to her while in the hospital" was not "extreme" or "outrageous" conduct).

**[14]** The Restatement of Torts, cited with approval by the *Cluff*, *Mintz*, and *Nelson* courts suggests that a reasonable trier of fact could find that Byrd's conduct rises to the level of outrageousness:

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement 2d of Torts, § 46, comment (d). Byrd's behavior did not comprise "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Despite society's "rough edges," Craig should not be required to become "hardened to" her supervisor repeatedly propositioning inside and outside of the office, following her into the bathroom, standing outside the toilet stall and then grabbing her and sticking his tongue in her mouth. While this conduct is

deplorable in any setting, a reasonable observer or trier of fact could find it to be "outrageous" and "extreme," particularly in an employment context. Consequently, we reverse the district court's grant of summary judgment with respect to Byrd on Craig's claim of intentional infliction of emotional distress.

[15] Arizona law is clear, however, that an employer is rarely liable for intentional infliction of emotional distress when one employee sexually harasses another. Liability for the employer typically attaches only when a company utterly fails to investigate or remedy the situation. *See, e.g.*, *Ford v. Revlon, Inc.*, 734 P.2d 580, 585-86 (Ariz. 1987); *Smith v. Am. Express Travel Related Servs. Co., Inc.*, 876 P.2d 1166, 1173-74 (Ariz. Ct. App. 1994). The Mahoney Group did not abdicate its duty to investigate and take remedial measures once Craig reported Byrd's conduct. We conclude that Craig has not met the high standard under Arizona law and we affirm the district court's grant of summary judgment in favor of The Mahoney Group and Patricia Roberts on this claim.

2. Negligent investigation, hiring, supervision and retention

[16] Craig next asserts two related claims: negligent investigation and negligent hiring, supervision and retention of Byrd. With the exception of "willful misconduct" on the part of the employer, these claims are barred under Arizona law by the remedy of workers compensation. *Ford*, 734 P.2d at 586; *Irvin Investors, Inc. v. Superior Court*, 800 P.2d 979, 980-82 (Ariz. Ct. App. 1990); *see also Mosakowski v. PSS World Med., Inc.*, 329 F. Supp. 2d 1112, 1129-31 (D. Ariz. 2003) (interpreting Arizona law). Craig has made no showing that The Mahoney Group's actions amounted to "willful misconduct" and we consequently affirm the grant of summary judgment for all Appellees on these two claims.

3. Assault and battery

**[17]** Craig further alleges that Byrd's kiss in the bathroom constitutes assault and battery. The district court granted summary judgment with respect to Roberts and The Mahoney Group, but denied summary judgment and dismissed the claim with respect to Byrd on this claim.**⁴** Craig has made a prima facie case under Arizona law that the kiss was an unwelcome "offensive touching." *Johnson v. Pankratz*, 2 P.3d 1266, 1268-69 (Ariz. Ct. App. 2000). We affirm the district court's denial of summary judgment with respect to Byrd, but reverse its dismissal and reinstate Craig's assault and battery claim.**⁵** We affirm the grant of summary judgment in favor of Roberts.

**[18]** With respect to The Mahoney Group, under Arizona law, Craig would be entitled to recover from the company for any of Byrd's tortious acts as long as he was acting within the scope of his employment. *See State v. Schallock*, 941 P.2d 1275, 1279-81 (Ariz. 1997); *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 5 P.3d 249, 254 (Ariz. Ct. App. 2000); *see also Wiper v. Downtown Dev. Corp.*, 732 P.2d 200, 201 (Ariz. 1987). The district court did not explain why no triable issue exists with regard to whether Byrd could be considered to have been acting within the scope of his employment when he took Craig to the On the Border restaurant. We reverse the district court's grant of summary judgment in favor of The Mahoney Group with respect to liability for Byrd's alleged assault and battery and remand to the district court for further proceedings.

### 4. Invasion of privacy

---

**⁴**Craig has since re-filed this claim against Byrd in state court.

**⁵**We assume that the district court dismissed the state assault and battery claim because it dismissed her Title VII claims, which were the basis for the district court's jurisdiction. *See* 28 U.S.C. §§ 1331, 1367(a). Because we hold that at least one of Craig's federal claims survives summary judgment, we reverse the dismissal of her surviving state claim as well. *See* 28 U.S.C. § 1367(c)(3).

**[19]** Craig also alleges invasion of privacy under Arizona law. Although Byrd's conduct was inappropriate, we conclude that it does not meet the stringent standard required by Arizona law. *See Hart v. Seven Resorts, Inc.*, 947 P.2d 846, 853 (Ariz. Ct. App. 1997) (holding that an individual is only liable for an invasion of privacy only if he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person"); *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos. Inc.*, 30 F. Supp. 2d 1182, 1189 (D. Ariz. 1998) (holding that a plaintiff can only recover if she has an "objectively reasonable expectation of seclusion or solitude in the place" (emphasis omitted)). Craig had no reasonable expectation of privacy in the common area of the restroom, where she would expect her conduct to be observed by other individuals in the restroom. *See, e.g.*, *United States v. Billings*, 858 F.2d 617, 618 (10th Cir. 1988) (per curiam) (holding that no reasonable expectation of privacy exists as to what "can be observed by any ordinary patron of a public restroom"). Byrd only entered the common area of the restroom; consequently, we affirm the grant of summary judgment in favor of all Appellees on this claim.

5.   Defamation

**[20]** Craig takes issue with some of the statements Byrd made to the investigator, and alleges that his mischaracterizations are defamatory and constitute slander. Under Arizona law, Craig must show that Byrd's statements were false and brought her into "disrepute, contempt or ridicule, or . . . impeach[ed her] honesty, integrity, virtue, or reputation." *Turner v. Devlin*, 848 P.2d 286, 289 (Ariz. 1993). She cannot make such a showing because statements made during sexual harassment investigations are generally conditionally privileged. *Miller v. Servicemaster by Rees*, 851 P.2d 143, 145-46 (Ariz. Ct. App. 1992); Rest. Torts § 596. We affirm the grant

of summary judgment for all Appellees with respect to this claim.[6]

### III.   CONCLUSION

With respect to The Mahoney Group, we reverse the district court's grant of summary judgment in favor of The Mahoney Group on Craig's Title VII hostile environment claim and her claim for respondeat superior liability on the assault and battery claim; we affirm the grant of summary judgment in favor of The Mahoney Group on all other claims. We affirm the district court's denial of summary judgment for Leon Byrd on assault and battery, but reverse its dismissal and reinstate Craig's claim; we reverse the grant of summary judgment for Leon Byrd on the intentional infliction of emotional distress claim, but affirm the grant of summary judgment in favor of Byrd with regard to all other claims. We affirm the district court's grant of summary judgment in favor of Patricia Roberts on all claims. Without expressing any views on the ultimate strength of Craig's claims, we remand to the district court for further proceedings consistent with this opinion. Each party will bear its own costs.

**AFFIRMED**   in   part,   **REVERSED**   in   part,   and **REMANDED**.

---

[6]Craig appears to have abandoned her civil rights claim under Arizona Revised Statutes §§ 41-1461-1465, and her claim for retaliation in violation of Title VII. These claims are not properly before us, so we will not address them.